In the Matter of the Probate of the Will of Robert D. Kaufmann, Deceased. Walter A. Weiss, Appellant; Joel S. Kaufmann et al., Respondents.

First Department, March 19, 1964.

*Milton Pollack* of counsel (*Irving K. Rubin* with him on the brief), for appellant.

*Milton Levy* of counsel (*John W. Castles, 3d,* and *Leonard S. Leaman* with him on the brief; *Lord, Day & Lord,* attorneys), for Joel S. Kaufmann and another, respondents.

*Leon Herzfeld,* special guardian, in person, for Richard Kaufmann and another, infants, respondents.

McNally, J. This will contest is limited to the issue of undue influence. The contestants are the distributees of, and the proponent is unrelated to, the decedent. Two juries have found undue influence. On the prior appeal, by a divided court, the decree denying probate was reversed and a new trial directed because of error (14 A D 2d 411). Appellant argues the proof in its totality fails to establish a jury question on the issue of undue influence. This court's prior determination impliedly held that the contestants had established a prima facie case on the issue of undue influence. (*Politi* v. *Irvmar Realty Corp.,* 13 A D 2d 469.) As a matter of sound policy, the law of the case should apply.

The instrument offered for probate is dated June 19, 1958. The decedent, Robert D. Kaufmann, was then 44, unmarried, a millionaire with a substantial income. Robert's sole distributees were two brothers, Joel and Aron. Joel is married and his sons are Richard and Lee, infants over 14 years of age. Aron is unmarried and an invalid.

Robert had inherited all his wealth from his parents. He had no liking or aptitude for business. His inherited wealth consisted principally of minority interests in various family enterprises in which he did not actually participate.

In and prior to 1947 Robert was intimately and warmly associated and identified with his relatives; he lived with his brother Joel in Washington and was particularly attached to and fond of his nephews, Richard and Lee. In 1947 Robert took up painting, an interest which he pursued and developed with increasing involvement with the passage of time and with a great measure of artistic success. During the latter part of 1947 or early 1948, Robert came to New York City and set up his own establishment. He was then about 34.

Until about 1951 Robert maintained his apartment at 965 Fifth Avenue. In 1951 he purchased a five-story town house at 42 East 74th Street. In addition, in 1955 Robert acquired a Summer house in Quogue, Long Island, and in 1958 a Winter home in Key West, Florida.

It would appear that Robert and the proponent, Walter A. Weiss, met in 1948. Weiss was the senior of Robert by five years. Weiss did not testify at either of the two trials. In his pretrial examination Weiss stated he was an attorney who did not practice. His pedigree, resources and means of income in 1948 do not appear.

On June 15, 1948 an agreement prepared by Weiss was entered into between Robert and Weiss whereby Weiss was retained as "financial advisor and business consultant" at an annual "retainer" of $10,000 for the period of one year with the right in Weiss to terminate the arrangement on "one weeks' notice, if he [Weiss] finds conditions make it impossible in his opinion to function effectively". The agreement recites the purpose of Weiss to advise Robert as to his then investments and towards the end of "developing new opportunities for financial profit", it also recites: "It is contemplated an office will be maintained and probably a corporation will be formed, as dictated by maximum business gain."

Robert paid Weiss annually thereafter the sum of $10,000; in addition, he made tax-free gifts to Weiss of about $3,000 during the years 1956, 1957 and 1958. Weiss also received from Robert $4,500 for his services in the sale of a hotel owned by Robert.

Soon after June, 1948 the books and records of Robert were transferred from Washington to New York. Theretofore Robert's records had been kept by employees of Robert's

family in Washington at no expense to Robert. Washington was the main business headquarters of the family.

During the latter part of 1948 offices were established at 630 Fifth Avenue and announcements printed of the opening on January 6, 1949 of offices as " financial consultants " by " Walter A. Weiss and Robert D. Kaufmann ". Robert paid all office expenses; Weiss contributed his time. The venture earned no fees for financial consultations during the 10 years of its existence. The sole investment made was in a garage construction enterprise adverted to as " Multi-Deck " in which Weiss' brother was the principal. On Weiss' advice Robert invested $120,000 therein and the end result was a total loss.

In 1949 Weiss moved into Robert's apartment at 965 Fifth Avenue. Weiss lived with Robert until the latter's death on April 18, 1959.

The five-story town house at 42 East 74th Street, purchased in 1951, was extensively renovated. The top floor was made an office, a full-time secretary employed; the remainder of the building was elaborately furnished and appointed as living quarters. A full-time cook was employed. Weiss took full charge of the establishment, its furnishing, the employment of help and the maintenance of the household. All mail and incoming telephone calls were routed to and through Weiss.

Robert and Weiss travelled to Paris in 1950 for a few months; to Europe, West Indies, the Virgin Islands, Haiti, Greece and other countries during 1952 and 1953 and around the world in 1956. Robert paid all expenses. Weiss claims to have paid his share of living and travel expenses but we have no evidence other than his declaration on that score.

On April 19, 1950 Robert made a will providing for bequests to his father's and brother's wives, his father's secretary who had for many years been in charge of Robert's records, his housekeeper and art teacher, the Institute for Psycho-Therapy, Inc., and the Lillian Swope Foundation. To Weiss he devised the stock in Multi-Deck. In addition, Robert cancelled Weiss' indebtedness to him. The will recited provision had been made for an aunt of Robert by way of insurance. The residue was divided into four parts: two for the benefit of his brothers and two for the benefit of his two nephews. Three executors were nominated — Robert's father, his brother Joel and his cousin Donald.

The 1950 will reflects a natural testamentary disposition in the light of the nature and extent of Robert's estate, his family and his known relations to and with others.

Weiss had made efforts to insinuate himself into the good graces of Robert's family without success. The investment counseling project was his brainchild. In his view it contemplated the exploitation of his knowledge by Robert's family. Weiss' pretrial deposition is that "he [Robert] understood that on the facts his main contribution would be his contacts and the possibility for new business that might arise through his family and his companies, or through other connections that he might have. And we sent announcements of the opening of this business to all of his friends and business connections".

No business was forthcoming. Robert's family was unimpressed. Weiss was frustrated. He had succeeded in inducing Robert to place the utmost confidence in him but had been totally rejected by Robert's family. On April 4, 1951 Weiss' confidential memorandum to Robert states:

"It would be a good thing for me if I were able to achieve polite, formal business relations with your brother [Joel]. What he thinks of me personally cannot concern my business life. I have always felt that he has no faith in me and his surface facade was a ' double-dealing ', painful, and embarrassing to us both. It would surprise me if we were able to work well together, in the light of the record. At your request I am willing to try, and a full discussion of these present communications is a likely starting point. I repeat — Joel's personal appraisal of me is not in issue since I feel he does not know me. Your own continued confidence is naturally very gratifying, particularly in the face of so much family unpleasantness. That, too, however, I must reject from my door, as an inevitable part of your own family set-up.   *   *   *

"Does Joel inherit your Dad's position as sole and unquestioned business authority for you? Does he want that responsibility? Unquestionably he craves it and you don't want to give it to him. Do you have to? Is there any insult implied in your refusing to assume Aron's status business-wise? If not, do you have the right to choose an adviser? Has Joel made any active honest effort to work with him? Why would he not welcome such a release from discretionary responsibility? *   *   * It is only lately when Joel was willing to show his hostility openly that you stated to me, if you did not have me advising you independently of your family, you would seek someone else. I believe Joel finds it most acceptable to his pride to consider that I have instigated an independent will in you for my own purposes; that you serve my selfish desire to mix into his all-important, fascinating business machinations

— all out of some kind of misguided weakness of will! How distorted and ridiculous can a situation get? * * *

" There is certainly a lot of resentment and a fundamental lack of understanding. I think you are finally growing up and realize you are not playing marbles. Each of you seems to think he is being treated like a child, and that the other is acting like a spoiled child. A free exchange of real feelings would clear the air and might lead to harmony and mutual respect — even admiration; very different qualities from the love always talked about in families and unfortunately so seldom present. We tried this speaking out earnestly and openly last Christmas in Washington and were woefully defeated. Your Dad and I finally came to cases, and that in a few days, only when we were willing to talk openly and assume good faith. I'm ready to meet on that basis if you want me to, but I've turned in my whipping-boy outfit and have no more stomach for that thankless role. Stop arguing so much about me and my abilities. Work out the hard facts of your own relationships and objectives, then you can easily enough agree on the mechanics. Joel has only one brother in Aron's circumstances, not two; you must make him understand that and be glad of it."

Weiss had concluded that Joel, Robert's brother, had assumed management of the family's business ventures to the exclusion of Robert and Aron. Aron was physically unable to assume or share the responsibility. Robert had been indifferent and submitted to Joel's assumption of responsibility. It also appears that Robert attempted unsuccessfully to persuade his family to accept Weiss as his substitute in the exchange of views as to business matters. Weiss found it necessary to persuade Robert that he was " growing up ", " not playing marbles ", not to submit to being " treated like a child " and " make him [Joel] understand that and be glad of it " that Robert was not as helpless as Aron.

Joel presented an insurmountable obstacle to Weiss' full and complete control of Robert's financial affairs. Weiss accused Joel of " double-dealing " and of resenting the fact that he, Weiss, had " instigated an independent will " in Robert.

If, in fact, Weiss had aroused in Robert a drive for independence, had persuaded him to inform himself and assume the right to make his own decisions in matters of business and otherwise, there could be no objection even though Robert saw fit to be advised by Weiss. However, if Robert was unwilling or unable to assume responsibility in financial and other matters, and Weiss was aware of it and using Robert against Joel and

his family to further his own selfish ends and purposes, then the question arises whether thereby Robert's testamentary disposition was influenced and whether it was permissible or undue influence.

It cannot be doubted that prior to 1948 Robert was dependent on Joel in financial matters; that Robert was not involved in decision making; he had shown no interest in such involvement; that he was warmly attached to his family and had no serious differences with them. Weiss' pretrial statement does not suggest otherwise.

Shortly after taking up with Weiss, Robert's financial records were transferred from Washington to New York; Robert employed Weiss as financial adviser, and they launched the venture of financial consultants. There is no reality to support the marked changes. There is no evidence of any particular qualifications on the part of Weiss in financial matters; there is no suggestion of any practical reason for assuming the burden and expense of the maintenance of records in New York and the transaction of business away from the center of the family financial activities in Washington. There is no realistic expectancy of any demand for the services of either Robert or Weiss as financial consultants. On the other hand, these activities may have served to inspire Robert with a false feeling of accomplishment and independence.

Weiss' pretrial statement is: "I remember his [Robert] asking me if I would undertake to represent him and to handle his affairs and to help him be independent so that he could take his affairs unto himself." In addition, Weiss said that Robert was obsessed with the idea of independence and Weiss offered to help him towards that end. If Weiss successfully persuaded Robert that he was achieving independence when, in fact, Weiss was extending and exploiting Robert's dependence and estranging Robert from his family, then he violated his undertaking and the issue is presented whether the instrument offered for probate is a product of the breach of faith.

In 1949 Robert opened a checking account with Bankers Trust Company. Weiss was given power to draw against this account. Soon thereafter a similar arrangement was made as to an account with Chemical Bank New York Trust Co. Thereafter, until Robert's death, Weiss had the power to draw against all Robert's bank accounts. In 1951 Weiss acquired a general power of attorney from Robert. Weiss had unrestricted access to Robert's safe-deposit box.

The record establishes that since 1950 those selected by Weiss rendered medical and legal services to Robert. In 1951 Robert changed his attorneys. On June 13, 1951 he executed a new will. This enlarged Weiss' share of Robert's estate. In addition to personal effects and paintings, the will devises to Weiss the 74th Street residence and one half of the residue, and he is made the trustee of several trusts and one of three executors, the others being Robert's brother, Joel, and Robert's psychiatrist, Dr. Janet M. Rioch. Weiss' expectancy under the provisions of this will was over $500,000.

Contemporaneously with the will of June 13, 1951 Robert signed a letter of the same date purporting to explain his will. The letter affirms the will contains unusual provisions in that '' a sizeable portion '' of Robert's estate is devised to a man '' not a member of my family ''. The letter to Robert's brothers proceeds to state the reasons for the provisions. It recites that Robert first met Weiss in 1946; that Robert's outlook was then '' approaching the nadir ''; he was a '' frustrated time-wasting little boy ''; he was '' terribly unhappy, highly emotional and filled to the brim with a grandly variegated group of fears, guilt and assorted complexes ''. It states that Robert fortunately met Walter who encouraged him to submit to psychoanalysis. In addition, the letter goes on to state:

'' Walter gave me the courage to start something which slowly but eventually permitted me to supply for myself everything my life had heretofore lacked: an outlet for my long-latent but strong creative ability in painting  *  *  *  a balanced, healthy sex life which before had been spotty, furtive and destructive; an ability to reorientate myself to actual life and to face it calmly and realistically. All of this adds up to Peace of Mind — and what a delight, what a relief after so many wasted, dark, groping, fumbling immature years to be reborn and become adult!

'' I am eternally grateful to my dearest friend — best pal, Walter A. Weiss. What could be more wonderful than a fruitful, contented life and who more deserving of gratitude now, in the form of an inheritance, than the person who helped most in securing that life? I cannot believe my family could be anything else but glad and happy for my own comfortable self-determination and contentment and equally grateful to the friend who made it possible.

'' Love to you all,
'' Bob.''

The letter is accompanied by an envelope addressed to Robert's brothers and the Kaufmann family. The envelope is unsealed. The letter and envelope thereafter accompanied the three succeeding wills prepared by attorneys other than the one who drew the will of 1951. Prior to 1954, the 1951 letter was in the possession of the attorney who had drawn the 1951 and the 1953 wills. In or about May, 1954, the letter of June 13, 1951 and the letter of October 23, 1952, hereafter described, same into the possession of Weiss who caused them to be delivered with the 1953 will to the attorneys who thereafter prepared the last two wills.

The letter of 1951 fixes the year 1946 as the year of meeting between Robert and Weiss. The record evidence is that this event occurred in 1948. The anticipation of their meeting by more than one year is significant in that it was during 1947 and before Robert met Weiss that Robert took up and commenced his career in art. It is in the artistic area that Robert was productive and accomplished. Weiss was not an artist. Robert's art teacher was provided for in the wills prior to but was excluded from the will offered for probate.

The 1951 letter is not based on reality. Robert had become aware of his desire to paint, had received instruction and had started painting prior to his meeting with Weiss. The will of 1950 provides for a bequest of $2,500 to Leo Steppat " my art teacher ". Weiss had nothing to do with Robert's creative ability in painting. In attributing to Weiss the " start [of] something which slowly but eventually permitted me to supply for myself everything my life had heretofore lacked: an outlet for my long-latent but strong creative ability in painting ", the letter is not in accord with the record. Weiss in his pretrial statement acknowledged he did not know why Robert attributed to him his painting career.

The letter refers to the " courage " acquired from Weiss " to supply for myself * * * a balanced, healthy sex life which before had been spotty, furtive and destructive ". The implication is that Weiss in some fashion was identified with Robert's sex life. Weiss' pretrial statement emphatically denied it.

To the extent that the letter implies or suggests a marked improvement of a previously disoriented and fearful personality, it is again at odds with reality as will appear.

Assuming, however, the content of the letter, it completely fails to explain the extent of the testamentary gift to Weiss tantamount to over a half million dollars.

On March 11, 1952 Weiss prepared a memorandum to Robert which stated: "*9. INSURANCE* Life and other insurance should be transferred to New York to Frenkel Bros." In force at the time were insurance policies in the face amount of $100,000 on the life of Robert issued between 1937 and 1940. As a result of correspondence between Weiss and Frenkel & Co., Inc., insurance brokers, between June and September, 1952, Weiss was substituted as primary beneficiary as to policies in the face amount of $75,000, and as to the $25,000 policy initially payable to Birdie Ross, Weiss was designated the secondary beneficiary.

Weiss' pretrial deposition falsely denies he was in any way involved in the transfer of the life insurance policies from Washington to New York; denies knowledge of any details concerning the change of beneficiaries, except as to the policy naming Aunt Birdie; and denies recollection of the communications whereby the changes were effected. On the death of Robert, because of double indemnity provisions in some of the policies, Weiss collected $117,290.17. No explanation appears for the change in beneficiaries in 1952.

On October 23, 1952, Robert executed a most unusual document. Thereby Weiss was granted exclusive power over Robert's corporeal remains, and the authority to make all funeral arrangements; in addition, in the event he was incapacitated by reason of mental or physical disability, Weiss was granted the power to consent in Robert's behalf to the performance of any operation he deemed necessary after consultation with Robert's physicians. The instrument provides Weiss is to act as "though he [Weiss] were my nearest relative * * * and that his instructions and consents shall be controlling, regardless of who may object to them". Robert was then 38 and so far as appears, physically well, and the profound concern with death, illness and hospitalization and the complete, almost sacrificial surrender of his corporeal remains to Weiss is most unusual.

The will of April 8, 1953 designates Weiss sole executor. Shortly thereafter, on May 28, 1953, Weiss' confidential memorandum to Robert states: "*6. WILLS* — Your will should be gone over, since there is at least one point needs changing."

On December 11, 1953 Robert wrote to Joel regarding the Fairfax situation. The Kaufmann brothers, including Robert, owned blocks of stock in a chain of 80 to 90 jewelry stores, established by their father, operating as Kay Jewelry Stores. The Fairfax Company was the purchasing agency of the jewelry stores. The Kaufmanns also owned stock of Fairfax Company.

A merger was proposed. Weiss was opposed to and strongly advised Robert against it. At the core of the opposition was the ratio at which the shares in the new Fairfax corporation were to be exchanged for the shares of the old Fairfax corporation. The required percentage of shares had consented to the merger and included the members of the Kaufmann family other than Robert. Robert so advised by Weiss objected to the merger. As minority stockholder he was entitled to a statutory appraisal.

The letter of December 11, 1953 acknowledges that amicable negotiations between Joel and Weiss do not seem possible; that Robert does not wish to get involved in the unpleasant business controversy with his brother and he has therefore retained counsel so that it will obviate his role as a "go-between". Robert then observes: "Perhaps now, with no such matters between us, we can devote our time to being real friends, because the source of irritation, namely business friction, will no longer be present."

The Fairfax litigation ranged over a period of about four years. The original valuation of Robert's shares was about $225,000 and the ultimate award was $285,000. On March 3, 1958 Robert ruefully observed: "You [Joel] also know from the Fairfax suit that what looked to be a matter that would take a few months went on for years and all those legal expenses cost quite a lot. Also, you did get a good deal more for your stock than I did, and I think the fact that I got more than originally offered, shows that some benefit was had from the idea of starting the suit." Joel aptly responded on March 12, 1958: "In regard to the law suit, the fact that I did get more for my stock than you did has no bearing on this matter. You had the same offer that I had in the original transaction. Had you gone along with the rest of the family, you would have fared equally as well without any legal expenses."

The Fairfax litigation was initiated by an application for an injunction to enjoin the exchange of stock. Charges of fraud were leveled at Joel. The fraud charges were summarily dismissed. Weiss in his pretrial statement disclaimed any knowledge of the charges of fraud; he attributed them to the New York attorney advising Robert thereon. The attorney testified the litigation was conducted by Washington attorneys and: "I exercised no supervision over that litigation. They kept me informed from time to time, but I assumed no responsibility for it at the time." The alleged fraud was factually baseless; those intimately identified with the litigation disclaim responsibility.

No one suggests Robert advanced the claim; the record conclusively shows he was not so disposed. On the other hand, the record abundantly shows Weiss resented Joel and had conveyed to Robert uncomplimentary opinions as to Joel's integrity.

The emotional base reflected in the letter of June 13, 1951 is gratitude utterly unreal, highly exaggerated and pitched to a state of fervor and ecstasy. The jury could have found, in addition, that Weiss conveyed to Robert false accusations as to Joel's integrity and mismanagement of the family enterprises. If the accusations were intended to and did cause Robert to disinherit members of his family in whole or in part, Weiss exercised undue influence. (*Matter of Anna,* 248 N. Y. 421, 427; *Matter of Budlong,* 126 N. Y. 423, 432.)

On May 5, 1954 Weiss forwarded to attorney Lloyd Garrison the will of April 8, 1953 together with the letters of June 13, 1951 and October 23, 1952, and a covering letter stating that Robert "wants to make a new will as soon as possible". Mr. Garrison, by letter dated May 10, 1954, acknowledged the documents and stated he had discussed the matter with his partner, Mr. Rochlin. A draft of the proposed will was transmitted to Robert with Rochlin's letter dated May 21, 1954. The draft provided for the appointment of Weiss and Garrison as executors and trustees. The draft followed a conference between Robert and Rochlin on May 6, 1954. On May 25, 1954 Robert signed a letter to Rochlin returning the draft and requesting changes including a provision for the appointment of Weiss as sole executor instead of the provision in the draft appointing Weiss and Garrison jointly.

The May 6 conference was solely between Robert and Rochlin. Among the matters discussed was Robert's investment in the Multi-Deck Corporation. At the time Robert was still persuaded the corporation had good possibilities although it was in difficulties. Robert said he wanted the stock in the company to go to Weiss with provision in his will that it was to bear its share of the estate tax. Robert directed that one half of the residuary go to his two nephews, Richard and Lee. They also discussed the executors to be named and Rochlin was told to designate Weiss and Garrison executors and trustees. The 1953 will contained *an interrorem* clause providing that the devise to one contesting the will shall lapse. Rochlin informed Robert his firm's policy was to recommend to a client not to put such a clause in his will.

Significantly, Robert at the time spoke of the letter of June 13, 1951. Rochlin read the letter. Robert inquired whether it was advisable to leave the letter with his will. Rochlin said he would talk with Garrison about it. Rochlin's office memorandum of June 10, 1954 states that on the previous day, when the 1954 will was executed, Robert again read the letter and on Rochlin's recommendation it was placed with the will together with the burial instructions of October 23, 1952. It does not appear what, if any, discussion was had between Robert and Rochlin; Robert did not discuss the letter with Garrison.

In July, 1955 Robert took title to a Summer home in Quogue, Long Island. Title closed July 22, 1955. Two days prior thereto a letter signed "E. Goldstein, secretary" was mailed to Garrison requesting in behalf of Robert that a codicil be prepared devising the property to Weiss. On July 29, 1955 Garrison responded advising a new will. It counsels as follows: "This will necessitate retyping the whole will, but it will simplify matters in the end because if you have a codicil, the executors will have to give notice to your residuary legatees, when the will and codicil are offered for probate, and give them a chance to come in and object to the codicil on the grounds of undue influence."

On October 21, 1955 a new will was executed substantially like the 1954 will with the additional provision for the devise of the Quogue property to Weiss.

Following the Fairfax litigation Weiss raised questions regarding the Kaufmann family venture in Reading, Pa. The Kaufmann Furniture Company was engaged in the furniture business and occupied property owned by Swope Realty Company. Robert and his two brothers each owned a one-third interest in the business and real property. On February 25, 1958 Robert purportedly dictated a letter to Walter S. Surrey, an attorney representing the Kaufmann interests. It reads, in part: "Believe me, you would not 'appreciate' receiving my comments on Joel's letter. I will write my poor brother directly, repeat for the hundredth time and as gently as possible that he must let me out of this sickness either by paying me off or selling the business. I hereby release you from any need to concern yourself about the Kaufmann Furniture Company."

Weiss' pretrial statement is that Robert typed the letter to Surrey dated February 25, 1958 and that he, Weiss, did not dictate it. His attention was directed to the initials "em" in the lower left hand corner and Weiss volunteered this might be an inversion of "me" identifying the writer, Robert.

Edith Earle Moffat, a real estate broker and in 1958 a public stenographer residing in Key West, Florida, testified that Weiss dictated the letter of February 25, 1958; that the initials "RDK" thereon were put there by direction of Weiss and the initials "em" were hers.

The letter of February 25, 1958 could have been found by the jury to have been the product of and dictated by Weiss. The letter is critical of certain practices relative to the furniture company and emphasizes they were opposed to the advice of "Walter", who is Weiss. It forecasts: "I will write my poor brother directly, repeat for the hundredth time and as gently as possible that he must let me out of this sickness either by paying me off or selling the business."

On March 3, 1958 a letter was addressed to Joel signed "Bob". It reads, in part:

"I appreciate the way you set out the position on Kaufmann Furniture and certainly regret for you all the work and effort you have put into this sick business. You know from long back, and I told Surrey long ago, that I want to be so far from any business kind of situations or any need to read reports or make decisions that I am perfectly content to see my money in tax exempt bonds. This I think, is about the last business situation where you and I alone (plus Aron, of course) are involved together so that we have to agree on a course, and I want to put it to you that in all fairness, you are overdue in giving me a break. You have had everything pretty much your way in all the business things which God knows, you are well entitled to and seem to want in your life; and I feel now it is high time you listen to my vote in this furniture situation—which is to get out.

"If you don't want to sell the business for what it will bring, then pay me out."

On February 25, 1958 Weiss also dictated a letter to his secretary which sets forth in detail his financial analysis of the furniture company and is highly critical of and implies improprieties on the part of Joel.

Joel's letter of March 12, 1958 in response to the letter of March 3, 1958 is informative, moderate and receptive to the suggestion of final liquidation of Robert's family interests. Negotiations towards that end proceeded to and past June 19, 1958 on which date Robert executed the instrument sought to be propounded as his will.

On April 18, 1958 Robert wrote to Joel a warm card of congratulations on his being designated "Man of the Year". On

May 20, 1958 a letter allegedly dictated by Robert and signed "Bob" by Weiss' secretary was addressed to Garrison reciting:

"the personal situation with my family has changed considerably since the Fairfax suit. I now wish you to make a new, very simple will for me, leaving all property, real estate, tangible assets, etc., plus a beneficial life interest in the Kay Jewelry Store stocks stamped 'To be offered to the Kay Stores before selling' to Walter A. Weiss * * *.

"Also, if not previously disposed of, I wish to give my nephews Richard D. and Lee S. Kaufmann, my one-third share of the Kaufmann Furniture Company * * *. Furthermore, I think there should be a non-contesting clause written in, and also a paragraph saying that in the event of my marriage, my widow and heirs should receive three-quarters of the above estate and one-quarter would go to Walter A. Weiss. In either case, I name him as sole executor."

A postscript inquired: "Can't all this be done on one page?"

Negotiations were then pending for the liquidation of Robert's interest in the furniture business. If the business was disposed of, the bequest to the nephews would fall.

The letter of May 20, 1958 is inconsistent with the facts. The Fairfax suit had terminated, allegedly to the satisfaction and profit of Robert. During the period the suit was in spirited litigation, on June 9, 1954 and October 21, 1955, Robert executed wills providing for his brother Aron, his nephews, various friends, his art teacher and The Arts Fund Inc., who were to be completely excluded by the proposed will. The Fairfax litigation involved only Joel. Moreover, nothing in the record suggests a marriage of Robert at that or any other time. In addition, Robert had been told by Rochlin in 1954 that his firm advised against a "non-contesting clause".

On May 22, 1958 Garrison caused to be delivered to Robert a five-page memorandum directing his attention to the fact that his then will provided for Aron, his father's former secretary, his former art teacher and other provisions. Other questions were raised. The final paragraph reads: "My suggestion is that you consider these questions with Walter [Weiss] and that then we should get together for a brief discussion, because I know from experience that in the course of discussion other questions will arise, and that we cannot work this all out by correspondence."

On June 5, 1958 there was a telephone conversation between Garrison and Robert. Garrison's memorandum of that date

states Robert desired to modify the proposal of May 20, 1958 by leaving the Kay stores stock outright to Weiss, omitting the provisions for a wife and children and providing that the furniture stock go to Weiss if the nephews predecease Robert.

No draft of the will was submitted to Robert; he did not meet with Garrison as suggested by the latter and they had no discussion or talk regarding the radical departure from the testamentary plan of the 1955 will. The execution of the will on June 19, 1958 offered for probate took 15 to 20 minutes and involved only the formalities.

Louise Wiener was temporarily engaged by Weiss in place of his secretary Evelyn Cohen. Her employment lasted from the latter part of May to the middle of June, 1958. During this period the instrument offered for probate was under consideration. Louise testified that Weiss then said to Robert in her presence: '' Come on in, Bob. I want to talk with you about your will.'' Robert and Weiss then proceeded to Weiss' office. Weiss closed the door.

Louise also testified there was a file in the office labeled '' R. D. K. Will ''. The file was in a three-drawer filing cabinet. No such file was discovered after Robert's death. Weiss' secretary denied the existence of the file. The jury could have found her as incredible as Weiss.

The record shows beyond dispute that prior to 1948 Robert had no financial responsibilities and had assumed none. His affairs were in the hands of his brother Joel, whose holdings and financial interests were the same as Robert's. Robert had a large fortune, a substantial income and no responsibilities. Unquestionably Robert was dependent on Joel as to matters of investments and management of his various interests. All of this was being attended to without expense to Robert.

Robert was endowed with a good mind, sensitivity, artistic ability and generous disposition. He earnestly sought independence. However, he had no prior experience in assuming responsibility; all decisions had been made for him. He sought help and direction to satisfy his drive for independence. He turned to Weiss for that help. Weiss acknowledges he was originally retained by Robert '' to represent him and to handle his affairs and to help him be independent so that he could take his affairs unto himself ''.

The arrangement was not one of master and servant or principal and agent; it was a confidential relationship more in the nature of teacher and pupil in the area of finance with specific application to the resources and assets of Robert. It had a

very ominous inception. The agreement dated June 15, 1948 prepared by Weiss, a lawyer by training, obligated Robert for one year, provided for annual compensation of $10,000, the sum demanded by Weiss and not objected to by Robert, and was terminable at the option of Weiss on one week's notice. Weiss was retained as "financial advisor and business consultant". This one-sided agreement may, perhaps, be justified on the premise that Weiss was entitled to make the best bargain and was not then under any legal obligation to protect Robert. Weiss' attitude did not augur well for the qualities of fairness and loyalty required on his part to achieve Robert's desire for the capacity to be independent in matters of business.

The record is barren of evidence of Weiss' prior training or experience as a financial advisor or business consultant. We know that apart from his intrusion upon the various enterprises of the Kaufmann family the two proposals he espoused were dismal failures and caused Robert substantial losses and expenses. The Multi-Deck business involved a loss of $120,000. The partnership formed by Weiss and Robert to conduct the business of business consultants and advisors never acquired a client and resulted in much expense to Robert.

Weiss and Robert lived together from 1949 to the date of Robert's death. The evidence enabled the jury to find that Robert became increasingly dependent on Weiss socially and businesswise. Moreover, it supports the view that this dependence was encouraged and that Weiss took affirmative steps to insulate Robert from his family and persons he sought to cultivate.

Robert gave Weiss his unbounded confidence and trust. Weiss exploited Robert, induced him to transfer to him the stewardship formerly exercised by Joel, increased Robert's need for dependency, prevented and curtailed associations which threatened his absolute control of Robert and alienated him from his family.

Weiss, in his memorandum of April 4, 1951, attributes to Joel the following description of his role which the jury could have found to be the fact: "I believe Joel finds it most acceptable to his pride to consider that I have instigated an independent will in you for my own purposes; that you serve my selfish desire to mix into his all-important, fascinating business machinations — all out of some kind of misguided weakness of will!"

Weiss was responsible for the displacement of the attorneys who prepared the 1950 will; he introduced Robert to Garrison

who prepared the instrument offered for probate. Weiss recommended the doctors who treated Robert; he employed all help who came in contact with Robert. Mail and telephone communications were routed through Weiss. Family mail at times was destroyed and did not reach Robert. Correspondence purporting to be from Robert was dictated by Weiss.

Weiss saw to it none other than himself took advantage of Robert. Weiss warned Mapson, Robert's companion on the trip, not to take advantage of Robert during their stay in Paris in 1953. Finally, Weiss arrived in Paris unannounced and in the presence of Robert, who stood by mutely, told Mapson to remove himself. Robert attempted to maintain secretly his contact with Mapson in New York but was found out by Weiss who physically intervened. Again Robert submitted silently.

Anne McDonnell, the housekeeper and cook, testified Weiss was master of the household and brooked no interference from Robert. She also testified there were occasions when Weiss insisted that Robert sign papers without opportunity to read them and that Robert complied.

Watkins, a banker friend of Robert's father, testified he talked at length with Robert about the Fairfax matter. On one occasion Weiss was present and did all the talking while Robert was mute. On another occasion Watkins was alone with Robert and his only response was: " That's the way Walter [Weiss] wants it."

Robert perceptibly lost weight during the latter years, in part due to a low cholesterol diet. He became disinterested in his attire and appearance. After 1950 he received extensive psychiatric treatment, the nature of which does not appear.

In 1955 Robert complained of inability to sleep. His inability to sleep continued until his death. He took large quantities of pills for the condition which included doriden, miltown, seconal and nembutal—medication to reduce tension and induce sleep. He was unable to sleep without medication. On April 18, 1959, asleep at his home in Key West, Robert died in a fire which destroyed the house.

The record is replete with financial matters pertaining to Robert's interest in family investments. The suggestion is that Robert became estranged from his family because of financial matters. The jury could have found that Robert did not wish to be concerned with matters of business; that the differences based thereon were introduced by Weiss for the purpose of causing a breach between Robert and his family.

Significant is the unconcern with which Robert accepted the loss of $120,000 in the Multi-Deck venture promoted by Weiss. Nathan Katz, an attorney who knew Weiss since 1920, met Robert through Weiss. Katz represented Robert on the purchase at East 74th Street. In December, 1956 Katz purchased Robert's entire interest in Multi-Deck for $25. Multi-Deck then had a bank balance of $29.48.

The Fairfax matter in the final analysis involved considerably less than Multi-Deck. If Robert was affected by monetary considerations, then his continued reliance on Weiss after 1956 in the light of the Multi-Deck debacle is unexplained.

Robert and Weiss lived lavishly, travelled and entertained extensively. Despite the scale of living, which would appear to have been at the expense of Robert, and the ill-advised financial ventures, he left an estate of over one million dollars.

Also significant are the provisions for members of Robert's family, his friends, his art teacher, his father's secretary and organizations in the wills of Robert prior to 1958 during the pendency of the Fairfax litigation. Other than Joel, none of the omitted beneficiaries were identified with the Fairfax litigation.

The record demonstrates overwhelmingly that Robert retained until his untimely death great affection for his nephews, warmth toward and, at times, to the evident chagrin of Weiss, considerable concern for the health and good opinion of Joel. In fact, Weiss found it necessary to reassure Robert. Weiss' memorandum to Robert of March 11, 1952 observes: '' The above considerations are important and call for some conferencing. They have all been sidestepped and avoided for all this time since your dad's death because of emphasis of tactful handling with Joel. This care did not prevent his having a heart attack, but at least the business disadvantage absorbed is compensated for by a certainty you did not upset him.''

Robert's letter to Joel of March 3, 1958 affirms: '' You also know that Freeman had firm instructions not to bother you in any way with appearing in connection with the suit, since your health is more important to me by far than money.''

The documents of record, ostensibly emanating from Robert, which tend to explain his testamentary disposition, are in all important aspects at odds with the facts. The Fairfax suit is the sole reason assigned in the letter of May 20, 1958 for the testamentary scheme reflected in the instrument offered for probate and in the light of the facts it fails to explain it.

The record becomes clear if it is viewed in the light of a skillfully executed plan by Weiss to gain the confidence of Robert, displace Joel as manager of his financial affairs, assume control of Robert's bank accounts, safe-deposit box, household and property as if it were his. The only impediment against completely relieving Robert of his worldly goods was the circumstance that his investments in the main were closely tied in with those of Joel and his brother Aron. To overtly seize Robert's property would risk a challenge by his family. So long as Robert was under his control and influence, Weiss was assured of a life of ease and luxury. He, therefore, need only direct Robert toward making him his principal beneficiary in the event of his death. This he could do without the knowledge of the family. The result was to be substantiated by written declarations of Robert assigning reasons for the unnatural disposition.

On June 13, 1951 Robert purported to explain the will of that day with substantial provisions for Weiss on the basis of gratitude. In June, 1952 Weiss was made beneficiary as to the bulk of Robert's life insurance. The latter transaction is unsupported by any written explanation by Robert. In June, 1958 the ultimate testamentary disposition to Weiss is explained by the writing of Robert on the basis of the Fairfax suit.

Following the death of Robert, Weiss disclaimed knowledge of the letter of June 13, 1951; disclaimed knowledge of the details of the change of beneficiaries as to the insurance policies and averred initial knowledge after Robert's death of the instrument offered for probate. In all of these respects the jury could have found Weiss lied deliberately.

Contestants' medical expert testified the record evidence delineated a personality with pathological dependency; one unable to deal with reality, insecure, unstable and who tends to submit unreasonably to the will of another. There was no expert medical testimony to the contrary.

One may make testamentary disposition of his worldly goods as he pleases. The motives and vagaries or morality of the testator are not determinative provided the will is the free and voluntary disposition of the testator and is not the product of deceit. There are two principal categories of undue influence in the law of wills, the forms of which are circumscribed only by the ingenuity and resourcefulness of man. One class is the gross, obvious and palpable type of undue influence which does not destroy the intent or will of the testator but prevents it from being exercised by force and threats of harm to the testator or those close to him. The other class is the insidious, subtle

and impalpable kind which subverts the intent or will of the testator, internalizes within the mind of the testator the desire to do that which is not his intent but the intent and end of another. (*Marx* v. *McGlynn,* 88 N. Y. 357; *Rollwagen* v. *Rollwagen,* 63 N. Y. 504, 519.)

If it appeared to the satisfaction of the jury that Weiss willfully alienated Robert from his family by falsely accusing Joel of fraud and mismanagement in the conduct of the family business enterprises for the purpose of causing Robert to disinherit members of his family, then the jury properly could have found undue influence. (*Matter of Anna,* 248 N. Y. 421, *supra*; *Tyler* v. *Gardiner,* 35 N. Y. 559, 595.)

The fact that the relation between Robert and Weiss may have afforded Robert some satisfaction did not enable Weiss deceitfully, improperly and insidiously to turn Robert against his family. (*Matter of Budlong,* 126 N. Y. 423, 432, *supra*; *Rollwagen* v. *Rollwagen, supra,* p. 520.)

We are concerned with the testamentary mind, intent and purpose of Robert on June 19, 1958, when the instrument offered for probate was executed. To what extent Weiss affected Robert's mind and whether, if at all, he influenced his testamentary intent can only be determined upon a close examination of the interaction between the two over the course of the period between 1948 and the time of death, April 18, 1959. When the influence, if any, is ascertained, we can then address ourselves to the question whether it was within legally permissible bounds or exceeded them and was therefore undue influence.

The weight of the evidence is that in 1948 Robert was 34, educated, unmarried, personable, wealthy, interested in art, and otherwise not particularly occupied. Prior to 1948 he had lived with his brother Joel in Washington; he was particularly fond of Joel's two children, Lee and Richard, who were his only nephews. His immediate family consisted of his brothers Joel and Aron. Aron was unmarried and an invalid. Joel had assumed the burden of managing the family fortune.

Robert's father had launched over 80 jewelry stores throughout the United States operating as separate corporate units in which the three brothers had more or less equal interests. The family fortune derived from this enterprise. Robert inherited his fortune from his parents, and it was represented by interests, with his brothers, in the various family enterprises. The business headquarters of the family was in Washington where all financial records of Robert were kept by a former secretary of his father.

Management of the family business was in the hands of brother Joel. Robert enjoyed a substantial income; he had no business responsibilities and no expense so far as the conduct of his financial affairs.

In 1948 Robert maintained an apartment on Fifth Avenue, New York City.

The record is also clear that in 1948 Robert had no financial responsibilities. He had no experience or training in affairs of business or finance. For reasons which do not appear, Robert at this time was possessed of the desire to act independently in business matters. Robert employed Weiss for the purpose of advising him in financial matters so that he could proceed independently. Weiss so states: "I remember his asking me if I would undertake to represent him and to handle his affairs and to help him be independent so that he could take his affairs unto himself.

"Q. In other words, there seemed to be this drive to be independent at that time; is that correct? Oh, yes.

"Q. You offered to help him in that endeavor; is that correct? A. Yes."

Weiss exploited the arrangement to advance his own selfish interests.

Appellant does not seriously urge that the change of the life insurance beneficiaries, the various gifts and the prior wills may not have been influenced by Weiss. He strenuously urges that the evidence fails to show he influenced the will of June 19, 1958.

The first of the four wills in which provision is made for Weiss is dated June 13, 1951. The letter signed by Robert the same day is cogent evidence of his complete domination by Weiss. Its exposure, implications and distortions can be understood only as an attempt to justify what is obviously unnatural and utterly inconsistent with reality and what the record establishes was the warm and close relation between Robert and his family. Apart from the content of the letter, two significant factors are present: a change from the attorneys who prepared the 1950 will and the substantial provisions for Weiss. The letter came into existence long before the Fairfax affair and evidences the presence of forces operating on Robert's mind in favor of Weiss to the detriment of Robert's family. The same forces continued to operate with ever-increasing potency to the date of Robert's death and at all times in favor of Weiss and against Robert's family and ultimately against his friends and persons who had served him faithfully.

Weiss sought to disassociate himself from the letter of June 13, 1951. Weiss on April 23, 1959 wrote to Aunt Birdie enclosing a copy with the comment: "I never saw this letter and I am amazed he was moved to write it as far back at '51." This was a false statement made by one with guilty knowledge of its origin and purpose, one of many similar statements with which this record is replete.

Weiss' deliberately false pretrial testimony is that he first learned he was a testamentary beneficiary of Robert after his death. The record shows indisputably Weiss' involvement with each of the wills since 1950; copies were in the vault to which he had the right of access he frequently exercised. In May, 1954 Weiss caused the prior will and the letters of June, 1951 and October, 1952 to be delivered to Garrison. Here, again, Weiss disassociates himself from circumstances cogently pointing to his involvement in and responsibility for the testamentary disposition made by Robert.

The record enabled the jury to find that the instrument of June 19, 1958 was the end result of an unnatural, insidious influence operating on a weak-willed, trusting, inexperienced Robert whose natural warm family attachment had been attenuated by false accusations against Joel, subtle flattery suggesting an independence he had not realized and which, in fact, Weiss had stultified, and planting in Robert's mind the conviction that Joel and other members of the family were resentful of and obstructing his drive for independence.

The fact that the instrument offered for probate was prepared by reputable, competent attorneys is a relevant circumstance but does not preclude a finding that the undue influence here involved was active, potent and unaffected by the interposition of independent counsel. (*Matter of Anna,* 248 N. Y. 421, 425, *supra.*) Far more extensive interposition by independent counsel has been held not to be conclusive on the existence of undue influence. (*Smith* v. *Keller,* 205 N. Y. 39, 43.)

If Weiss was in Europe at the times he became beneficiary of the life insurance policies and at the times when the four wills were executed in which he is named, and Robert was living in New York near or with his family, much of the argument made by counsel for appellant would be compelling. The assumed situation is what was present in *Marx* v. *McGlynn* (88 N. Y. 357, *supra*). There, Bradley was in Europe, 3,000 miles away from the testatrix in New York when she executed the will. The testatrix lived with her sister and was among friends with whom she was brought up. However, there had been a long close relation between Bradley and the testatrix. Bradley had

been spiritual advisor of the testatrix; had been her traveling companion and had shown great influence over her. The court there observed that Bradley did not influence the testatrix as to her property, or alienate her from her relatives; that at all times she had and kept control and that Bradley was given no control over her property; moreover, that Bradley was not her agent with respect to her property.

All of the elements adverted to in *Marx* and not present there are here conclusively established. In addition, there is here proximity to the point of oneness, and the presence of Weiss within the same household at the times the wills were made and the beneficiaries displaced in respect of the life insurance.

In *Marx* the court held there was a presumption of undue influence on the part of Bradley which, however, the Surrogate held had been overcome and the Court of Appeals affirmed, saying (p. 371): "But there are certain cases in which the law indulges in the presumption that undue influence has been used, and those cases are * * * a will * * * of * * * a ward in favor of his guardian, or any person in favor of his priest or religious adviser, or where other close confidential relationships exist."

Here, the circumstances spell out a confidential relation between proponent and the decedent which gave rise to an obligation on the part of the proponent-devisee to offer an explanation. The language of this court in *Matter of Satterlee* (281 App. Div. 251, 254) is apropos: "Surely, in the light of the unusual setting and the highly fiduciary relationship which proponent had assumed toward decedent, it was incumbent on him to come forward and explain his becoming the principal beneficiary under her will".

*Matter of Walther* (6 N Y 2d 49) is distinguishable on the facts. Here, we are concerned with a marked departure from a prior, natural plan of testamentary disposition which excessively and unnaturally favors a nonrelative under circumstances establishing motive, opportunity, overreaching and persistent involvement in transfers and dispositions of property in contemplation of death.

The issue of undue influence was submitted to the jury without the benefit to the contestants of any presumption. The charge placed the unrelieved burden of establishing undue influence upon the contestants. The issue was given to the jury in the aspect most favorable to the appellant; appellant made no exception to the charge. The record overwhelmingly sustains the verdict on undue influence on the basis of the charge made.

The decree denying probate of the instrument dated June 19, 1958 should be affirmed, with costs to respondents payable out of the estate.

WITMER, J. (dissenting). This case comes to us upon appeal by the proponent from the decree of New York County Surrogate's Court denying probate of the propounded will, entered upon the jury's verdict declaring that the instrument was procured by undue influence practiced upon the testator. A prior jury had reached the same conclusion, and this court (*Matter of Kaufmann,* 14 A D 2d 411) reversed and ordered a new trial, saying in part (p. 413): "the verdict of the jury is against the weight of the credible evidence, and, in fact, some of us in the majority are of the opinion that upon the authority of *Matter of Walther* (6 N Y 2d 49) there was not sufficient evidence of undue influence to justify the submission of the question to the jury, and that the most that was shown was the existence of lawful influences arising from the claims of a close relationship which were not inconsistent with an assumption that the will expressed the voluntary intent of the testator." We agree with that expression of opinion. Upon the second trial each side added to the proof of the factual contentions in its favor made upon the first trial. It is not disputed that the testator was competent to make a will nor that the will was executed in accordance with the required legal formalities. There is no claim nor evidence of coercion.

The case for the contestants is grounded completely upon circumstantial evidence, and consists of evidence of a relationship between the testator and the proponent Weiss begun in the late 1940's and continuing until testator's death in April, 1959. No specific act is relied upon as constituting the alleged undue influence inducing the propounded will; but the claim is that from about 1950 testator was under the complete domination of Weiss.

It appears that Weiss was born in 1911 and the testator in 1913. They each had interests in art and literature. Neither of them married. The testator was a millionaire by inheritance, and Weiss was without material assets of consequence. Weiss had been admitted to practice law, but never practiced. He claimed to have skill as a financial consultant, and did some writing, including poetry. In 1948 the testator and Weiss entered into a written agreement by which ostensibly the testator employed Weiss at an annual salary of $10,000 to advise him in financial matters. In January, 1949 testator and Weiss

entered into a partnership as financial consultants and opened offices therefor; but in fact they never did any such business. Contestants' evidence negates the value of Weiss' financial ability and services to the testator. In 1949 Weiss was given power of signature on all of testator's bank accounts, and soon thereafter testator gave Weiss powers of attorney which were never revoked, including authority to enter testator's safe-deposit box. Testator placed his business affairs largely in Weiss' hands and had complete confidence in him.

On April 19, 1950 the testator made a will in which for the first time he named Weiss as a beneficiary, giving him his personal effects and stock in Multi-Deck Corporation (which then had prospects, but little value), canceling any debt of Weiss to testator, and giving the rest of his property to his two brothers and two nephews. On June 13, 1951 testator duly executed a new will in which he increased the provisions for Weiss by including a watch and chain, testator's residence at 42 East 74th Street, and one half of his residuary estate. He made him trustee of some trusts provided for therein, and also made him one of the executors. On the same date he wrote a letter in longhand which he placed with said will as an explanation to his family of his reasons for giving so much to Weiss. Contestants claim that said letter was also procured through undue influence by Weiss upon the testator. The record shows both that Weiss knew of the letter when it was written and that upon the testator's death he denied to the testator's Aunt Birdie prior knowledge thereof. A will dated April 8, 1953 was substantially the same except for an increased charitable gift. A will dated June 9, 1954 made about the same provision for Weiss, but omitted testator's brothers and gave one quarter of the residue to each of his two nephews. A will dated October 21, 1955 contained substantially the same provisions as the one of June 9, 1954, except it included in the gift to Weiss a new Summer house just acquired by the testator at Quogue. In the propounded will, dated June 19, 1958, testator gave his interest in the Kaufmann Furniture Company, Reading, Pennsylvania, to his two nephews and gave the remainder of his estate to Weiss.

In the meantime, in 1952 the beneficiary on two of testator's Massachusetts Mutual Life Insurance Co. policies was changed to Weiss, so that upon testator's death Weiss received $63,183.01 therefrom; testator's Aunt Birdie received $31,633.22 therefrom and testator's estate received $43,652.30 therefrom. In addition, in the same year four of testator's policies with

Pennsylvania Mutual Life Insurance Co. in total face amount of $25,000 were made payable to Weiss.

In 1950 testator and Weiss took a trip to Europe and stayed there a few months. This was repeated in other years; and in 1956 they took a trip around the world. There is evidence that Weiss' expenses thereon were paid by him currently or were charged to his salary.

Testator relied heavily upon Weiss to attend to most administrative details and relied upon his business advice. The record shows that at an early date testator's father and brother Joel, and other members of his family and friends, resented testator's close relationship with Weiss. It also shows that Weiss knew this, and he had little love for them. Contestants charge that Weiss was the cause of their business differences with testator. They assert that Weiss was the mastermind behind all of testator's demands in his business relations with them, and who in the background prepared the letters which testator sent to them, many of which are in evidence. They also contend that Weiss used the differences thus arising between testator and his brothers as a means of encouraging testator to change his will in Weiss' favor; and there is evidence that Weiss had a hand from time to time in advising testator's attorneys as to testamentary changes testator desired. In support of the charge of undue influence contestants have also presented evidence that testator was subservient to Weiss' wishes on a number of occasions from 1952 onward, with particular reference to social relations. There is also evidence that testator used sleeping pills, lost weight and submitted to psychoanalysis.

This evidence has been sufficient to cause two juries to declare that testator's will was induced by undue influence. Was it sufficient therefor under the laws of this State?

It is elementary that the statutory right of a competent person to dispose of his property as he wishes may not be thwarted by disappointed relatives nor by jurors who think that the testator used bad judgment or was misled.

"Undue influence is a fact which must be proved by the contestant and not merely assumed to exist. (*Matter of Smith,* 95 N. Y. 516; *Matter of Ruef,* 180 App. Div. 203, affd. 223 N. Y. 582; *Matter of Rundles,* 216 App. Div. 658.) Like any other fact, it may be proved by substantial evidence but the circumstances must lead to it not only by fair inference but as a necessary conclusion. To avoid the will of a competent testator on the ground of undue influence, the contestant must show

facts entirely inconsistent with the hypothesis of the execution of the will by any means other than undue influence. [Cases cited.] '' (*Matter of Henderson,* 253 App. Div. 140, 145.)

'' So, too, the mere fact that one is the sole legatee or sole distributee is not in itself evidence of the exercise of undue influence. (*Matter of Dowdle,* 224 App. Div. 450, affd. 256 N. Y. 629.)

\* \* \*

'' A mere showing of opportunity and even of a motive to exercise undue influence does not justify a submission of that issue to the jury, unless there is in addition evidence that such influence was actually utilized (*Cudney* v. *Cudney,* 68 N. Y. 148, 152; *Matter of Reid,* 298 N. Y. 878).'' (*Matter of Walther,* 6 N Y 2d 49, 55.)

The verdict in this case rests upon surmise, suspicion, conjecture and moral indignation and resentment, not upon the legally required proof of undue influence; and it cannot stand.

The record shows that the testator was intelligent and generally healthy. The evidence that he lost weight was explained by his doctor who said that he had placed him upon a no-fat diet. True, the testator was not wholly like other people. He had little zest for business, which fact set him apart from his family. He had artistic ability, and particularly loved to paint. So did Weiss. They had common interests. Testator felt and said that he had uncommon ability as a painter and that some day he would be known for his artistic work. In this, he was not wholly wrong, for it appears that eighty museums have accepted his work for permanent display.

The record is replete with evidence of the friendly relation, indeed love and affection, that existed between testator and Weiss for a decade. There is no substantial evidence that their relationship was not one of mutual esteem and self-respect. The isolated incidents of testator bowing to Weiss' wishes on certain occasions over this period fall far short of conclusively pointing to a subserviency, when viewed in the light of all the evidence. True, testator relied upon Weiss in business and administrative matters, but that is not to say that testator was not essentially in command. There is evidence that at times testator made his own business decisions. The fact that Weiss advised testator in his business dealings with his brothers is not inconsistent with his position as testator's financial advisor. Moreover, the record shows that under the proposed Fairfax deal testator's brother Joel was to be paid more per share than the testator, which the testator

did not like, and that by reason of testator's lawsuit against his brother, testator collected about $70,000 more than he had been offered. Certainly, that affords no ground for suspicion of Weiss. The testator did not overlook his nephews; and the evidence shows that in 1955 at a time when he changed his will the testator had spent considerable money refurbishing Aunt Birdie's apartment; and chided his brothers with reference to their lack of concern for her. Substantial evidence also shows that for years prior to his death testator acted normally in his outward relations toward Weiss and other people in Weiss' presence. And within a few weeks of his death, in Key West, Florida, when Weiss wanted to return to New York City testator declined to do so at the time, and Weiss came on to New York alone. Such conduct on the part of the testator by no means permits of "a necessary conclusion" that the testator was dominated by Weiss. Although testator placed confidence in Weiss, the relationship was not that of attorney and client, and Weiss had no part, directly at least, in the preparation and execution of these wills. The prior decision of this court disposes of that aspect of this case (14 A D 2d 411, 413). It is noted also that in *Matter of Walther* (6 N Y 2d 49, 56, *supra*) the court observed "that Mrs. Barnard was a fiduciary acting as committee for her sister" did not aid contestants' position.

The letter written by testator on June 13, 1951, proponent's Exhibit 19, and placed with his will of that date, and later reviewed with his attorney and placed with later wills, shows the regard which testator had for Weiss. This letter appears to lay bare the fact and prove the suspicion which members of testator's family had of the intimate relationship which existed between the two men. That and the falsehoods told by Weiss may have been among the reasons why Weiss failed to take the witness stand upon the trial. In our opinion, however, there was no legal compulsion upon Weiss to testify beyond the testimony which he gave on the examination before trial and which was read at length upon the trial of this case.

The issue in this case is not what were the morals of these men, nor whether testator led a normal life, nor whether Weiss has been proved a liar. The issue is, does the propounded instrument represent the intrinsic wishes and will of the testator, or was it the product of the command of Weiss which the testator did not really want to follow, but was unable to resist? The veracity of Weiss, it is true, may not be ignored in considering this issue.

Every act of the testator from the date of Exhibit 19, June 13, 1951, to the time of his death was consistent with what he expressed in that letter. Contestants' argument that Weiss induced testator to write said letter, Exhibit 19, to build a case for leaving his estate to Weiss, does not ring true. It is not reasonable that the letter would have contained the candid statement about sex, if it were written for such ulterior motive. It is true that contestants claim that at every stage testator was dominated by Weiss; but the period of time alone negates that claim. It is not claimed that the testator was hypnotized by Weiss during all this period, and certainly no evidence thereof has been presented. The record shows that for years testator had business differences with his brother Joel; and it shows also that he rarely saw his relatives in the years in question. In the meantime his attachment for Weiss apparently grew; and testator openly proclaimed his friendship for Weiss. In Exhibit 19 testator expressed for the eventual information of his relatives why he wished to leave his assets to Weiss. As far as the motive is concerned the relationship may be likened to that of one who has a mistress. Morals aside, upon the facts in this case " Proof of the circumstance that the will was an unnatural one is lacking ". (*Matter of Henderson,* 253 App. Div. 140, 145, *supra.*) Of course, the court does not condone the relationship, but the moral law may not be substituted for the law of wills; and it should not be overlooked that difficult cases tend to make bad law. Undoubtedly the testator was influenced, but the evidence in this case is entirely consistent with the complete lack of undue influence. Yet, because of the suspicious circumstances involved, the majority of this court as well as the court below would deny him his legal right to dispose of his property as he has chosen to do.

Contestants' psychiatrist, Dr. Herman, testified that he did not know for what reason the testator was psychoanalyzed; that the testator was an introvert; and that another psychiatrist could reach a different conclusion than did Dr. Herman concerning testator's independence. However misguided testator was, in view of his admitted competence and the equivocation by Dr. Herman " The evidence is in no way inconsistent with the assumption that the will expresses the voluntary intent of the [testator] and does not satisfy the test that intervention and undue influence can only be established by evidence that is not inconsistent with a contrary hypothesis ". (*Matter of Walther,* 6 N Y 2d 49, 56, *supra.*)

There was, thus, no question of fact for the jury; and proponents' motion for a directed verdict should have been granted. The decree appealed from should therefore be reversed, with costs to all parties appearing separately and filing briefs, payable out of the estate, and the matter remitted to the Surrogate's Court with directions to admit the will to probate.

BREITEL, J. P., and RABIN, J., concur with McNALLY, J.; WITMER, J., dissents and votes to reverse, in opinion, in which STEVENS, J., concurs.

Decree, so far as appealed from, affirmed, with costs to respondents payable out of the estate.