In the Matter of MAURICE J. BURKE, Deceased. FRANKLIN L. BROSGOL, as Executor of MAURICE J. BURKE, Deceased, et al., Respondents; KATHLEEN JOY, Appellant.

Second Department, August 3, 1981

**APPEARANCES OF COUNSEL**

*Albert E. Gleeson (Morton N. Wekstein* of counsel), for appellant.

*Charles G. Banks, Jr.* (*Irving Leavitt* of counsel), for Franklin L. Brosgol, respondent.

*Robert Abrams, Attorney-General* (*Jerome K. Karver* and *Jonathan J. Silbermann* of counsel), for ultimate charitable beneficiaries, respondents.

OPINION OF THE COURT

GIBBONS, J.

This is an appeal from a decree of the Surrogate's Court of Westchester County, dated December 10, 1979, which admitted to probate a will of the decedent, dated August 23, 1978, following a contested probate trial at the conclusion of which the court granted proponent's motion to dismiss the objections upon the ground that the contestants had failed to establish a prima facie case of undue influence, lack of testamentary capacity and due execution and granted the proponent's motion for a directed verdict admitting the will to probate.

The contestants contend that the propounded will of August 23, 1978 did not represent the testamentary intentions of the decedent, who, at the time of its execution, was a very old man, severely ill in a hospital, and in a dying condition, but that the will is the product of undue influence and fraud upon an enfeebled and confused mind.

Viewing all of the evidence herein in the light most favorable to the objectants, and, after according the objectants the benefit of all inferences which can reasonably be drawn from it, I am of the opinion that the trial court erred in dismissing the objections and removing the issues of fact from the consideration of the jury (see *Patterson v Proctor Paint & Varnish Co.*, 21 NY2d 447; *Hazel v Sacco*, 52 AD2d 1042).

The trial testimony, to which I shall now allude, established the existence of issues of fact in relation to undue influence upon which, by a rational process of reasoning, the jury could have found a verdict for the contestants (see *Hazel v Sacco, supra*).

A review of the evidence discloses the following:

At the time of his death on October 9, 1978, the decedent,

a widower, was 88 years of age and possessed of an estate having an approximate value of $500,000, which included his dwelling house, located at Yorktown Heights, New York, where he had resided alone.

Sanford Leeds, an attorney, testified that he became the decedent's attorney in 1958 and had handled all of his legal work for a period of about 20 years. On July 19, 1971 he prepared and supervised the execution of a will for the decedent, in which the latter left the bulk of his estate to Kathleen Joy, Henrietta Ball and Wally May, the children of his deceased sister and the contestants in the instant matter, and $5,000 bequests to two acquaintances, Ms. Jay and Ms. Hermanson. On November 17, 1977 the decedent called him to his home and told him that he had decided to put himself into a nursing home and that he wanted said attorney to take over the management of his accounts. On the next day, the decedent executed a power of attorney to Mr. Leeds and delivered the keys to his safe deposit box to him for safekeeping. At that time they went through the contents of the box and reviewed the will which he had previously made.

At the decedent's request to help him find a nursing home, the attorney drove him to three different facilities, none of which he chose. On the ensuing weekend, while Mr. Leeds was away, he visited the nursing home operated by Mrs. Margaret Miller located at Thornwood, New York, and became a patient therein.

Although Mrs. Miller's nursing home was not licensed, she did, according to her testimony, have a hospital background and had been operating the nursing home for about 36 years. At the time when the decedent came into her nursing home, she had three or four other patients residing there. She provided his meals and, in general, took care of him. In December, 1977 she called Dr. Brosgol to provide the necessary medical care for the decedent.

In the chronological order of events, reference is now made to the testimony of a witness called by the contestants, Ms. Debbie Shearer, a licensed practical nurse, who testified that she was employed by Mrs. Miller as a nurse's aide in her nursing home, and that on several occasions during the

month of July, 1978, she heard Mrs. Miller tell the decedent "that his lawyer was trying to swindle him out of money and take everything that he had."

On August 8, 1978, Mr. Leeds received a telephone call from Mrs. Miller notifying him that Mr. Burke wanted to see him at once. Mr. Leeds went to visit Mr. Burke on the following day and described his meeting as follows:

"Q Would you tell His Honor and the Jury just what conversation took place?

"A When I went in there, I said, 'Hello,' and asked him how he felt and he said he didn't feel good and that, in fact, he was going to go to the hospital that night. That was the first I heard of that, and then I said, 'What did you want to see me about?' And he said, 'I didn't want to see you.' So I said, 'Well, Mrs. Miller called and said you wanted to see me.' And she said, 'You remember, Maurice, about the house. You wanted him to do something with the house.' So, then, Mr. Burke said, 'I want you —' and he recited it, like, he never spoke to me before. It was like, he was reciting, not talking, and he said, 'I want you to sell the house and give the money to Mrs. Miller to build a room for me.' And I said, 'Well, Mr. Burke, why don't we wait until you get out of the hospital, and then we can discuss it.' And the reason for that was, in all the time I had been handling things for him and even at the time he went into the nursing home, he had told me to dispose of everything, but the house. He felt, even though it was remote, he might be able to go back there, and that he wanted to have the door open to him in case he ever could go back."

Upon Mr. Burke's arrival at Northern Westchester Hospital, on August 9, 1978, he was diagnosed as having pneumonia, in addition to previously diagnosed chronic lymphocytic leukemia. Dr. Franklin J. Brosgol, his treating physician, described Mr. Burke as a "rather sick, elderly man." Shortly after his admission to the hospital, a diagnostic thoracentesis was performed.

On August 11, 1978 Mr. Charles Banks, the attorney for the proponent, was contacted and asked to meet with Mr. Burke. There is conflicting testimony with respect to who actually contacted Mr. Banks and requested his services.

There is no doubt that Mr. Banks had never met Mr. Burke prior to August 11. Mr. Banks testified that Dr. Brosgol had asked him if he would "interview" Mr. Burke. Dr. Brosgol, however, testified that while he contacted Mr. Banks and gave him some background, he told Mr. Banks that "he would get a phone call from Mrs. Miller about the situation." It was Dr. Brosgol's understanding that Mrs. Miller subsequently called Mr. Banks. Mrs. Miller, however, denied ever calling Mr. Banks. Mrs. Miller testified that Mr. Banks had never previously represented her.

Mr. Banks testified that he was told by Dr. Brosgol that Mr. Burke was *in extremis* and that he may not last through the night. This diagnosis, however, was denied by Dr. Brosgol. There is a statement in the nurse's report, which was received in evidence, that Mr. Burke was "somewhat confused" during the afternoon of August 11. Mr. Banks went to Mr. Burke's hospital room on the evening of August 11. He introduced himself, or one of the people in the room introduced him to Burke. Mr. Banks indicated to him that he was there at Dr. Brosgol's request, and, at that time, Mr. Burke asked him to change his will and said that Mr. Leeds had declined to do so. He, then, prepared a will in his own handwriting in Mr. Burke's presence using a list of Mr. Burke's assets which had been given to him by Mrs. Miller. One of the provisions contained in this will was a bequest of $5,000 to Theresa Jay, a friend of Mr. Burke. Ms. Jay, however, was deceased at the time the will was drafted. In addition, the will included a devise to Mrs. Miller of Mr. Burke's dwelling house. The residuary estate was given and bequeathed to "persons or organizations selected by my Executor, in his absolute discretion, for the general care and maintenance of aged persons." Dr. Brosgol was named as executor in this will; however, he testified that his appointment as executor was a complete surprise to him, and when Mr. Banks was questioned on cross-examination as to whether he consulted with Dr. Brosgol in this connection, Mr. Banks testified, "I guess not. I don't remember such discussion."

The August 11 will was executed and signed by Mr. Burke. Mr. Banks testified that he discussed the provisions of the will with Mr. Burke before he signed, and that, in his

opinion, Mr. Burke was of sound and disposing mind and memory at the time the will was executed. When questioned concerning whether Mrs. Miller was outside of the room at the time of the preparation and execution of the will, he testified, "She may well have been. It was a time when he was particularly ill and she was up taking care of him."

On the following day, August 12, 1978, Mr. Banks learned that Mr. Burke had lasted through the night and was stronger. He decided that the language of the August 11 handwritten will was "a little inelegant" so he called in his secretary and redrafted some of the sections. Most significantly, Mr. Banks provided therein that the outstanding liens on Mr. Burke's house be paid from the residuary estate so that the devise to Mrs. Miller would pass free and clear of any encumbrances. Mr. Banks testified that Mr. Burke did not request that change, but that he "volunteered it to him as a provision that he probably would want in his will and he agreed that that was what he wanted in his will."

The second will contained a similar bequest to the predeceased Ms. Theresa Jay, and the residuary estate was given to the executor for distribution by him among one or more organizations organized and operated exclusively for religious, charitable purposes to be used for the general care, maintenance and welfare of aged persons. Dr. Brosgol was again named the executor.

Mr. Banks conceded that this charitable residuary gift was incorporated in the document when it was drafted without prior consultation with Mr. Burke, but that he "discussed it with him before he signed it."

When Dr. Brosgol was questioned as to whether he had any prior discussion in relation to the broad power conferred upon the executor to appoint the beneficiary under the charitable residuary bequest of the second will, he testified: "I explained to Mr. Banks I felt very uncomfortable being saddled with that responsibility and that if Mr. Burke's medical condition improved that if he could make a more definite disposition of his estate and assets, I would feel better."

Mrs. Miller testified that on the same day, August 12, the decedent executed and delivered a power of attorney to her

in the hospital and described what she did under its authority, as follows:

"Q And thereafter August 12th you went into Mr. Burke's home and removed things; is that right?

"A No, sir, except what Mr. Burke sent me to remove.

"Q Did you sell these articles?

"A No, sir, not all of them. Some, Mr. Burke allowed me to sell, yes.

"Q And did you give Mr. Burke the money?

"A No, sir, he gave it to me.

"Q You kept it?

"A Yes, sir."

Between August 12 and August 16, Mr. Leeds received a telephone call from Mr. Banks notifying him that a new will had been drafted, that Mrs. Miller had been given a power of attorney, and that he (Leeds) had been discharged as Mr. Burke's attorney. Mr. Leeds went to the hospital on August 16 to discuss the matter with Mr. Burke. Mr. Leeds testified that Mr. Burke was in bed, had tubes in his nose for breathing and had great difficulty talking. Mr. Leeds asked Mrs. Miller who was present in the room, to leave the two of them alone. Mr. Leeds told Mr. Burke what Mr. Banks had told him and asked him if that was what he wanted. Mr. Burke replied that it was not and requested Mr. Leeds to handle the matter. Mr. Leeds then went out into the hall to get a nurse to witness the statement. After Mr. Leeds returned to the room, Mr. Leeds asked Mr. Burke in front of Mrs. Miller and a woman from the administration office of the hospital if he (Burke) had signed a new power of attorney. Mr. Burke denied signing such a document, at which time Mrs. Miller started screaming accusations at Mr. Leeds that he had stolen Mr. Burke's mortgages. According to the nurse's report, Mr. Burke became very upset and all visitors were barred. Mrs. Miller denied screaming at Mr. Leeds. She stated that she was outside the room and that she was not involved in any arguments.

On August 22, 1978, Dr. Paul Salkin, a psychiatrist, examined Mr. Burke at the request of Dr. Brosgol. He stated

that Mr. Burke was aware of the assets which he possessed and of those individuals who would be the natural objects of his bounty. In addition, he stated that Mr. Burke was disconcerted and anxious that his lawyer had presented him with a proposition to turn over his mortgages to his lawyer in return for a certain amount of money. It is not clear to which attorney Dr. Salkin was referring. Mr. Leeds testified that while he had talked with Mr. Burke about his mortgages in July, 1978, he never offered such a proposition to Mr. Burke. Dr. Salkin concluded the report by stating that Mr. Burke was confused about this issue and that the current situation with his lawyer was making him anxious. His report contained the following diagnosis and recommendation:

"DIAGNOSIS: 1. Mild organic brain syndrome, secondary to cerebral arteriosclerosis, consistent with patient's age and not of such a degree as to impair his competence regarding testamentary competence.

"RECOMMENDATION: I would recommend that the patient be interviewed on one or two more occasions to go into further detail regarding his current anxiety about his situation regarding his will, his assets and the situation with his lawyer so that he has an opportunity to discuss it fully and to achieve some clarity as to what he in fact does want to do. The situation is clearly a cause of anxiety for him and if he could be assisted with understanding it better and being able to make a decision that he really wants to make, I do believe that his anxiety would be considerably abated. As to the question of his testamentary competence as noted above, it appears to be in good order."

On August 23, the day after the psychiatric examination, Mr. Banks returned to Mr. Burke's hospital room with a third, typewritten will which also included the bequest to the predeceased Theresa Jay and the devise of his residential real property to Mrs. Miller, free and clear of all encumbrances. In addition, there were two specifically named residuary legatees, St. Patrick's Church in Yorktown Heights, New York, and the Missionary Franciscan Sisters of the Third Order of Peekskill in Peekskill, New York. Dr. Brosgol was named the executor. Present at the execution

of the August 23 will, the subject matter of the instant probate proceeding, were Mr. Banks, Dr. Brosgol and Ms. Linda Wilcox, all of whom acted as subscribing witnesses.

After Mr. Leeds was barred from the hospital on August 16, he called the hospital and was told that no visitors were permitted except Mr. Banks and Mrs. Miller. Mr. Leeds was never contacted by Mr. Banks about the August 23 will. The first time that he learned of its existence was when it was presented for probate. The next time Mr. Leeds saw Mr. Burke was on August 27, 1978, at the hospital. Mr. Leeds testified that Mr. Burke was unconscious and looked like he was dying. He could not talk and was very weary and thin. Mr. Leeds saw Mr. Burke on three more occasions prior to his death on October 9, 1978.

The witness Debbie Shearer also testified that in February, 1979, she called Mr. Leeds and Mr. Gleeson, the attorneys for the contestants, and played a tape recording, which she found on the premises in an envelope in which Mrs. Miller kept Mr. Burke's papers, of a conversation between Mrs. Miller and Mr. Burke which took place in September of 1978 after Mr. Burke had returned to the nursing home from the hospital. The conversation was retaped by Mr. Leeds from the tape recording Ms. Shearer played on the telephone. Ms. Shearer testified that the conversation concerned money and that Mrs. Miller told Mr. Burke that Mr. Leeds was trying to swindle him out of his money. She also testified that conversations of this kind continued until the time of Mr. Burke's death on October 9, 1978.

The Surrogate refused to permit the retaped recording and a transcript of the conversation to be used either as substantive evidence of the conversation or to impeach the credibility of Mrs. Miller who, while testifying as a contestants' witness, had earlier denied that she made the tape recording and later testified, out of the presence of the jury, that she had taped the conversation and that it was her voice.

The law is clear, as stated in *Matter of Walther* (6 NY2d 49, 55), that "[a] mere showing of opportunity and even of a motive to exercise undue influence does not justify a submission of that issue to the jury, unless there is, in addi-

tion, evidence that such influence was actually utilized." And situations may prevail where a testator, because of his appreciation for the care and attention given to him in his declining years, has given sizeable bequests to nursing home proprietors, as, for example, in *Matter of Haggart* (33 AD2d 124, affd 27 NY2d 900) and *Matter of Colbeck* (45 AD2d 796). However, under the posture of the trial evidence in the instant matter, the issue of undue influence should have been submitted to the jury. In failing to do so, the court committed error. Undue influence is seldom practiced openly, but it is, rather, the product of persistent and subtle suggestion imposed upon a weaker mind and calculated, by the exploitation of a relationship of trust and confidence, to overwhelm the victim's will to the point where it becomes the willing tool to be manipulated for the benefit of another.

The general rule defining undue influence is set forth in *Matter of Walther (supra,* pp 53-54), as follows: "The concept of undue influence does not readily lend itself to precise definition or description. But this court, long ago, had established the criteria by which undue influence is to be determined: 'It must be shown that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist. It must not be the promptings of affection; the desire of gratifying the wishes of another; the ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices, but a coercion produced by importunity, or by a silent resistless power which the strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear * * * lawful influences which arise from the claims of kindred and family or other intimate personal relations are proper subjects for consideration in the disposition of estates, and if allowed to influence a testator in his last will, cannot be regarded as illegitimate or as furnishing cause for legal condemnation' *(Children's Aid Soc. v. Loveridge,* 70 N. Y. 387, 394-395; see, also, *Smith v. Keller,*

205 N. Y. 39, 44; *Matter of Schillinger*, 258 N. Y. 186, 191)."

The different methods of exercising undue influence are discussed in *Matter of Kaufmann* (20 AD2d 464, 482-483, affd 15 NY2d 825), as follows: "One may make testamentary disposition of his worldly goods as he pleases. The motives and vagaries or morality of the testator are not determinative provided the will is the free and voluntary disposition of the testator and is not the product of deceit. There are two principal categories of undue influence in the law of wills, the forms of which are circumscribed only by the ingenuity and resourcefulness of man. One class is the gross, obvious and palpable type of undue influence which does not destroy the intent or will of the testator but prevents it from being exercised by force and threats of harm to the testator or those close to him. The other class is the insidious, subtle and impalpable kind which subverts the intent or will of the testator, internalizes within the mind of the testator the desire to do that which is not his intent but the intent and end of another. (*Marx v. McGlynn*, 88 N. Y. 357; *Rollwagen v. Rollwagen*, 63 N. Y. 504, 519.)"

In approaching the question whether an issue of fact for the jury's determination was generated by the trial evidence, it is necessary to consider the nature of the relationship existing between the testator and Mrs. Miller, and whether he reposed considerable trust and confidence in her. It is indeed not unusual for an elderly and very ill patient to develop a close and affectionate relationship with the individual upon whom he relies for his personal care and comforts on a daily basis.

With the general increase in the longevity of men and women, the elderly population in this nation has increased and will continue to do so, and, with such demographic change, more and more of the elderly will find themselves in the care of nursing home proprietors. It is inevitable that the aged and infirm, under such circumstances, will become very dependent upon those who tend their wants, and a high degree of confidentiality will develop under which the aged will reveal to them their closest thoughts

and the state of their financial affairs. Although the vast majority of those who so care for the aged are honest and dedicated professionals, the relationship is one from which the greedy and the corrupt may find considerable gain. Examples of such overreaching can be found in *Matter of Gordon v Bialystoker Center & Bikur Cholim* (45 NY2d 692, 698) where, in setting aside and ordering the return of charitable donations of about $28,000 to a nursing home by an aged and infirm patient, 85 years of age, the Court of Appeals, in recognizing the close and unique relationship existing between the parties, held as follows: "It is indisputable that on November 13, 1972, when the gift on which defendant predicates its claim to the funds in dispute was made, there existed between the donor and donee a fiduciary relationship arising from the nursing home's assumption of complete control, care and responsibility of and for its resident * * * The acceptance of such responsibility with respect to the aged and infirm who, for substantial consideration availed themselves of the custodial care offered by the institution, resulted in the creation of a fiduciary relationship and the applicability of the law of constructive fraud. Under that doctrine, where a fiduciary relationship exists between parties, 'transactions between them are scrutinized with extreme vigilance, and clear evidence is required that the transaction was understood, and that there was no fraud, mistake or undue influence. Where those relations exist there must be clear proof of the integrity and fairness of the transaction, or any instrument thus obtained will be set aside or held as invalid between the parties' *(Ten Eyck v Whitbeck,* 156 NY 341, 353)."

This court, in *Matter of Brandon* (79 AD2d 246), in affirming a decree directing a refund, encountered the overreaching by a nursing home proprietor, who, while enjoying the trust and confidence of an aged and infirm patient, contrived by undue influence to obtain a large sum of money and valuable gifts from her. The case of *Hazel v Sacco* (52 AD2d 1042, *supra),* provides another example where the court, in reversing the trial court's dismissal of a complaint at the close of the plaintiff's case, ordered a new trial on the issue which also concerned moneys obtained by undue

influence by a nurse's aide employed by a nursing home from a frail, elderly, confused lady suffering from chronic brain syndrome and where a relationship of trust and confidence existed.

Although the cited cases involve the enrichment by gifts *inter vivos* obtained from old and infirm patrons of nursing homes, the degree of confidentiality between such patient who delivers his largess in the form of a gift *inter vivos* is no different from the confidentiality between a nursing home custodian and a patient whose gift to him is in the form of a testamentary bequest.

Without passing upon or even surmising what findings a jury could have made in relation to the question of the possible exercise of undue influence, I am of the view that because of the following circumstances the matter should have been given to the jury.

Under the state of the evidence, the jury could have found that a relationship of trust and confidence had existed between the testator and Mrs. Miller, during the course of which she had acquired a list of his assets which she turned over to Mr. Banks, and that in the course of her dealings with Mr. Burke, there had been discussions between them concerning the sale of his dwelling house and the use of the proceeds to build a room for him in Mrs. Miller's place of business.

The jury could also have found that Mr. Leeds was the attorney for the testator for a period of about 20 years during which he handled all of Mr. Burke's legal work including his prior will made in 1971, and that, up until the time he entered Mrs. Miller's nursing home, a similar relationship of trust and confidence existed between them as attorney and client.

It is also apparent from the evidence that when Mr. Leeds was apprised, in Mrs. Miller's presence, that the testator wanted his home sold and a room built on her premises, he then made known his advice against such a precipitate move and counseled his client to wait.

In the face of this apparent stance by Mr. Leeds against such move, the jury could have then considered the testi-

mony of Debbie Shearer, who testified that she had heard Mrs. Miller tell Mr. Burke that his lawyer was trying to swindle him out of money and take everything that he had. In *Matter of Kaufmann* (20 AD2d 464, 474, *supra*), where false accusations denigrating the honesty and integrity of a trusted brother and advisor were utilized to inspire distrust in the mind of the testator, the court held: "The emotional base reflected in the letter of June 13, 1951 is gratitude utterly unreal, highly exaggerated and pitched to a state of fervor and ecstasy. The jury could have found, in addition, that Weiss conveyed to Robert false accusations as to Joel's integrity and mismanagement of the family enterprises. If the accusations were intended to and did cause Robert to disinherit members of his family in whole or in part, Weiss exercised undue influence. *(Matter of Anna,* 248 N. Y. 421, 427; *Matter of Budlong,* 126 N. Y. 423, 432.)"

After an appropriate charge on the law, the jury in the instant matter should have been given the opportunity to evaluate such testimony and attach to it whatever significance it determined to be sufficient. If it were believed by the jury, they could have concluded that the alleged slander was uttered in order to alienate the testator from his counsel and advisor.

In this matter the proof also shows that until August 11, 1978, Mr. Banks was unknown to the testator. How he came to be employed to prepare the three wills executed within a period of 13 days, between August 11 and August 23, 1978, remains shrouded in conflict and uncertainty.

Mr. Banks testified that Dr. Brosgol told him to interview Mr. Burke. Dr. Brosgol claimed that although he had communicated with Mr. Banks, he told him that he would get a call from Mrs. Miller "about the situation". Mrs. Miller, however, denied ever calling Mr. Banks or having had any prior dealings with him.

Here, it is quite clear from the testimony of Mr. Banks that he was given a list of Mr. Burke's assets by Mrs. Miller and, apart from her denial that she had called him into the matter, it does remain that she was a beneficiary under the will to the extent of a devise of Mr. Burke's dwelling house

and that, although not contained in the will of August 11, 1978, there was thereafter incorporated in both the August 12 and August 23 wills a provision that the said devise be free and clear of any outstanding liens, which were to be paid from the residuary estate.

In *Matter of Elmore* (42 AD2d 240, 241) the court, in affirming a decree denying probate to a writing propounded as the will of a 73-year-old, terminally ill, cancer patient upon the ground of undue influence, held, with respect to the connection between a testamentary beneficiary and the attorney preparing the will, as follows: "Where a will has been prepared by an attorney associated with a beneficiary, an explanation is called for (see *Matter of Lamerdin*, 250 App. Div. 133, 135), and *it is a question of fact for the jury* as to whether the proffered explanation is adequate." (Emphasis added.)

In the instant matter, the circumstances of the selection of Mr. Banks as the draftsman of the will herein propounded for probate, and Mrs. Miller's role as a participant therein, if any, were factors of concern to the fact finders on the issue of undue influence which should be resolved by them from the conflicting evidence adduced at the trial.

To summarize, it may be noted that on the question of undue influence, the jury could have considered, among other things, whether there was a long standing relationship of trust and confidence between the deceased and Mr. Leeds, his attorney, and that by uttering slanders and denigrating his honesty and integrity, Mrs. Miller was able to separate them and, thereby, deprive Mr. Burke of his counsel; whether, on the evidence, there was a close relationship between the decedent and Mrs. Miller and whether she exploited his frailty for her own personal gain; and whether she was either directly or indirectly instrumental in having Mr. Banks selected to prepare the will.

On this record, sufficient credible evidence was adduced at the trial to have, if believed by the jury, sustained the contestants' burden of proof on the issue of undue influence (see *Matter of Schillinger*, 258 NY 186; *Matter of Kindberg*, 207 NY 220, 228). Such finding would be inconsistent with the assumption that the will expressed the voluntary

intent of the testator *(Matter of Walther*, 6 NY2d 49, *supra)*. It was error to have removed the question of undue influence from the consideration of the jury, and a new trial on that issue must therefore be granted.

■ The trial court also erred in preventing the witness Debbie Shearer from testifying that she was present when Mrs. Miller made a tape recording of a conversation with the testator.

Mrs. Miller, as a devisee under the propounded will and the person alleged to have exercised undue influence upon the testator to induce its execution, was an adverse witness, and, unlike a friendly or unbiased witness, her credibility could be attacked by the testimony of the witness Shearer to refute Mrs. Miller's testimony in which she denied making such tape recording (see *Becker v Koch*, 104 NY 394; *Gonzalez v Medina*, 69 AD2d 14, 22; Richardson, Evidence [Prince, 10th ed], § 508).

Upon this record, the objectants have not established any deficiency in the proper execution of the will propounded and the testamentary capacity of the testator.

Accordingly, the decree should be reversed, on the law, with costs to the appellant, payable out of the estate, and the matter remitted to the Surrogate's Court for a new trial, before a different Judge, solely in relation to the objection pertaining to undue influence.

DAMIANI, J. P., TITONE and MANGANO, JJ., concur.

Decree of the Surrogate's Court, Westchester County, dated December 10, 1979, reversed, on the law, with costs to appellant payable out of the estate, and case remitted to the Surrogate's Court for a new trial, before a different Judge, in accordance with the opinion herein.