[991 NYS2d 251]

In the Matter of the Estate of WARREN J. SANGER, Deceased.

Surrogate's Court, Nassau County, June 30, 2014

### APPEARANCES OF COUNSEL

*Vishnick McGovern Milizio, LLP*, Lake Success (*Bernard Vishnick* of counsel), for petitioner.

*Gregory G. Shaub*, Port Washington, for objectants.

*Lisa Segal Poczik*, Woodbury, guardian ad litem.

### OPINION OF THE COURT

EDWARD W. McCARTY III, J.

In this contested probate proceeding, the petitioner, decedent's surviving spouse and primary legatee Michele Sanger, moves for an order pursuant to CPLR 3212 granting summary judgment admitting the proffered instrument dated April 1, 2005 to probate and dismissing the objections filed by decedent's children from a prior marriage, Stacie Peckett and Warren Sanger, Jr.

The decedent died on March 18, 2012. He was 69 years old. Decedent and petitioner were married on June 30, 2001. They had one child together, a daughter Sydney who was not quite five years old when her father passed.[1] An instrument purported to be his last will and testament, dated as aforesaid, and naming the petitioner as the executor, has been offered for probate. The propounded instrument leaves the decedent's tangible personal property to the petitioner as his surviving spouse and, if she predeceased him to any children of their marriage, and if none survived him to the respondents. The residuary estate pours over to a revocable trust dated and created at the same time. With the death of the decedent his wife is the primary beneficiary of the trust. On the same date that the will was executed decedent also executed a health care proxy and durable general power of attorney as part of his estate plan.

Respondents have filed objections to probate alleging that: (1) the alleged will was not duly executed as required by law; (2) on

---

1. The court appointed a guardian ad litem for Sydney, Lisa Segal Poczik, Esq., and her report dated May 5, 2014 has been submitted and considered. She recommends the will be admitted to probate.

the date of the making of the instrument, decedent was not of sound mind or memory and thus not mentally capable of making a will; and (3) the propounded instrument was not freely or voluntarily made or executed by the decedent, but was procured by fraud or undue influence practiced upon the decedent by the petitioner or others acting in concert with her.

Summary judgment may be granted only when it is clear that no triable issue of fact exists (*see e.g. Alvarez v Prospect Hosp.,* 68 NY2d 320, 324 [1986]; *Phillips v Kantor & Co.,* 31 NY2d 307, 311 [1972]). The court's function on a motion for summary judgment is "issue-finding" rather than issue determination (*Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395, 404 [1957]), because issues of fact require a hearing for determination (*Esteve v Abad,* 271 App Div 725, 727 [1st Dept 1947]). Consequently, it is incumbent upon the moving party to make a prima facie showing that he is entitled to summary judgment as a matter of law (CPLR 3212 [b]; *Zuckerman v City of New York,* 49 NY2d 557, 562 [1980]; *Friends of Animals v Associated Fur Mfrs.,* 46 NY2d 1065, 1067 [1979]; *Zarr v Riccio,* 180 AD2d 734, 735 [2d Dept 1992]). If there is any doubt as to the existence of a triable issue, the motion must be denied (*Hantz v Fishman,* 155 AD2d 415, 416 [2d Dept 1989]).

If the moving party meets his or her burden, the party opposing the motion must produce evidentiary proof in admissible form sufficient to establish the existence of a material issue of fact that would require a trial (*see Zuckerman v City of New York,* 49 NY2d 557, 562 [1980]). In doing so, the party opposing the motion must lay bare his or her proof (*see Towner v Towner,* 225 AD2d 614, 615 [2d Dept 1996]). "[M]ere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient" to overcome a motion for summary judgment (*Zuckerman v City of New York,* 49 NY2d 557, 562 [1980]; *see Prudential Home Mtge. Co. v Cermele,* 226 AD2d 357, 357-358 [2d Dept 1996]).

Summary judgment in a contested probate proceeding is appropriate where an objectant fails to raise any issues of fact regarding testamentary capacity, execution of the will, undue influence or fraud (*see e.g. Matter of DeMarinis,* 294 AD2d 436 [2d Dept 2002]; *Matter of Rosen,* 291 AD2d 562 [2d Dept 2002]; *Matter of Bustanoby,* 262 AD2d 407 [2d Dept 1999]).

There has been considerable SCPA and CPLR discovery in this matter, including documents produced; medical records and sworn examinations; and affidavits/affirmations submitted on

the motion, including those of the attesting witnesses, the petitioner, the attorney draftsman (Richard A. Siegal, Esq.), respondents and others. What material evidence has been forthcoming therefrom as argued by the parties to be germane is set forth with a recitation of the applicable law as to each of the objections.

The proponent of a will offered for probate has the burden of proving that the instrument was properly executed.[2] Due execution requires that the testator's signature be affixed at the end of the will in the presence of witnesses, that the testator publish to the witnesses that the instrument is his or her will, the attesting witnesses must know that the signature is that of the testator, and at least two of the attesting witnesses must attest to the testator's signature and sign their names and affix their residences within a 30-day period (EPTL 3-2.1). The supervision of a will's execution by an attorney will give rise to an inference of due execution (see e.g. Matter of Finocchio, 270 AD2d 418 [2d Dept 2000]; Matter of Hedges, 100 AD2d 586 [2d Dept 1984]). Further, as in the case at bar, if a self-proving affidavit and attestation clause accompany the instrument they also give rise to a presumption that the statutory requirements have been met (Matter of Farrell, 84 AD3d 1374 [2d Dept 2011]).

Objectants' sole opposing position on the issue of due execution is their legal argument that since attorney Siegal was not admitted to practice law in the State of New York at the time the will was executed (he was subsequently admitted in 2010), there is thus no inference of due execution.

■ Mr. Siegal, who has over 30 years of legal experience and whose practice primarily focuses on trusts and estates and related tax issues, has been admitted to practice law in several jurisdictions, the first apparently being the State of Connecticut. At the time of the execution of this will he was associated with the New York law firm Kelley Drye and worked with attorneys at that firm on this will and related estate documents. The witnesses to this will were both paralegals at that firm. Proponent is entitled to the inferences of due execution because, as the Court of Appeals has suggested, it is not where he or she is admitted to practice law or indeed whether the person

---

2. Petitioner and decedent executed their mutual wills at the same time. Having sought the estate planning advice of attorney Siegal at the same time, not atypically they had discussed their wills with each other in the absence of the attorney, separately with the lawyer without the other present and together with Siegal.

supervising the execution of the will is a lawyer at all, but rather the experience and knowledge of that person of the statutory requirements (*Matter of Kindberg*, 207 NY 220, 228 [1912] [the presumption of due execution applies "where the execution had been under the supervision of a lawyer or any person fully conversant with the statute requirements"]; *Matter of Cottrell*, 95 NY 329, 339 [1884] [the presumption of due execution of wills applies when they have "been conducted under the supervision of experienced persons, familiar not only with the forms required by the law, but also with the importance of a strict adherence thereto" (citations omitted)]).

At the risk of stating the obvious, far beyond inferences and presumptions at bar, is the unequivocal and unchallenged sworn statements and testimony of the attorney draftsman and the attesting witnesses to all the requirements of EPTL 3-2.1 having been met.

Accordingly, summary judgment is granted and the objection regarding due execution is dismissed as a matter of law.

The petitioner has the burden of proving testamentary capacity. From an overall perspective on the question of testamentary capacity, it is essential that the testator understand in a general way the scope and meaning of the provisions of his will, the nature and condition of his property, and his relation to the persons who ordinarily would be the objects of his bounty (*see Matter of Kumstar*, 66 NY2d 691 [1985]; *Matter of Bustanoby*, 262 AD2d 407 [2d Dept 1999]). Although he need not have precise knowledge of his assets, he must be able to understand the plan and effect of the will, and less mental faculty is required to execute a will than any other legal instrument (*see Matter of Coddington*, 281 App Div 143 [3d Dept 1952], *affd* 307 NY 181 [1954]).

■ Similarly situated to the due execution issue, in the first instance in her moving papers petitioner relies on the presumption of testamentary capacity arising from the circumstances of an attorney having prepared and supervised the execution of the will and the averments in the self-proving affidavit. As both witnesses attested that to the best of their knowledge decedent was of sound mind, there is a presumption that decedent was possessed of testamentary capacity (*Matter of Leach*, 3 AD3d 763 [3d Dept 2004]; *Matter of James*, 17 AD3d 366 [2d Dept 2005]). Additionally, once again beyond presumptions, there is every indication from the testimony and affidavits and affirmation submitted from those same people that Mr. Sanger was sufficiently competent to make a will.

Emphasis is placed by the surviving spouse on the fact that at the time of the making of the will, creation of the trust, etc., decedent was still an active practicing trial lawyer and partner at a well-known personal injury defense firm in Manhattan. Mr. Siegal relates his introduction to decedent two years prior to the execution ceremony and his retention by Mr. Sanger to address a buy-sell agreement for the law firm in addition to doing his estate planning. Beyond the references by the attorney draftsman to meetings, phone calls, revisions to documents and the like, Siegal avers: "I came to know decedent to be a sharp lawyer . . . and [he] had a distinct and effective way of expressing himself and discussing complex issues concerning his law firm and his estate."

In opposition on the question of testamentary capacity, respondents supply very little to even call into question decedent's mental faculties at the time of the making of the will. His children and their counsel allude many times to decedent's high degree of intelligence and refer to some physical maladies—diabetes, dropped foot, back pain and later incontinence—existing in 2005 and said to have worsened thereafter. Further, his former partner and longtime friend, with whom decedent parted ways in very ugly fashion (litigation ensued) over the latter alleging he had been wrongfully forced out of the law practice, submits an affidavit alluding to "concerns" "in or about 2005" regarding decedent's "general health" and his loss of focus, fatigue and allegations of diminished trial skills and deterioration thereafter.

None of the foregoing is sufficient to create a material issue of fact that on the date the will was executed the decedent was fully competent to execute a will.

By reason of the foregoing summary judgment is granted and this objection is also dismissed as a matter of law.

The burden of proof on the separate fraud and undue influence objections lies with objectants.

To prevail upon a claim of fraud, rather than a preponderance of the evidence, the higher standard of proof of clear and convincing evidence applies (see *Simcuski v Saeli*, 44 NY2d 442 [1978]) and objectants must show that the proponent knowingly made false statements to the decedent to induce him to execute a will that disposed of his property in a manner contrary to that in which he would have otherwise disposed of it (see *Matter of Gross*, 242 AD2d 333 [2d Dept 1997]; *Matter of Evanchuk*, 145 AD2d 559 [2d Dept 1988]).

■ There is sparse mention of fraud in the opposition submitted. At their depositions both respondents testified they had no personal knowledge of any fraudulent statements made to their father regarding his will. Counsel suggests that at some unspecified time and in some unspecified manner petitioner "did not properly" convey her husband's instructions to Siegal causing the will to not reflect his true intentions. The attorney points to a letter dated August 12, 2005 from son to father (exhibit 20) wherein the former suggests decedent may not be "fully aware" of the "implications" and "consequences of his will" and counsel infers (affirmation of objectants' counsel, Mar. 11, 2014, ¶¶ 48, 49) that in his affidavit Warren Jr. states he was told by decedent that he (Warren Sr.) had told both his wife and Siegal that leaving out Stacie and Warren Jr. in the will was not what he wanted. There is nothing in either the letter or the affidavit to explicitly or implicitly support these statements. The will was never changed.

The respondents have failed to sustain their burden on the fraud objection and therefore, so much of petitioner's motion for summary judgment as seeks to dismiss the respondents' objection on the ground of fraud is granted.

In order to prove undue influence, the objectants must show: (1) the existence and exertion of an influence; (2) the effective operation of such influence as to subvert the mind of the testator at the time of the execution of the will; and (3) the execution of a will, that, but for undue influence, would not have been executed (*Matter of Walther*, 6 NY2d 49 [1959]). Undue influence can be shown by all the facts and circumstances surrounding the testator, the nature of his will, his family relations, the condition of his health and mind and a variety of other factors such as the opportunity to exercise such influence (*see generally* PJI 7:55). It is seldom practiced openly, but it is the product of persistent and subtle suggestion imposed upon a weaker mind and furthered by the exploitation of a relationship of trust and confidence (*Matter of Burke*, 82 AD2d 260 [2d Dept 1981]). Without the showing that undue influence was actually exerted upon the decedent, mere speculation that opportunity and motive to exert such influence existed is insufficient (*see Matter of Chiurazzi*, 296 AD2d 406 [2d Dept 2002]; *Matter of Herman*, 289 AD2d 239 [2d Dept 2001]).

Oddly enough it was Warren Jr. who introduced his father to attorney Siegal sometime in 2003. Decedent had never executed a will before this one and it appears that he may have ap-

proached estate planning with ambivalence. His son (a financial planner) first suggested that decedent make a will. There is a form questionnaire from Siegal's then firm dated March of 2003 with relevant pedigree data on petitioner, decedent, etc. Things did not move forward for some time but when petitioner and decedent began to plan having a family of their own, their estate planning got more focused 18 months later.

This record is somewhat lacking in specifics as to when petitioner and/or decedent met face-to-face with Siegal or communicated in some other fashion. Siegal testified to one or more face-to-face meetings but that he never met with petitioner alone. There are memos to the file and correspondence by Siegal dated October 5, 2004, December 2, 2004 and a cover letter dated January 18, 2005 with drafts of the will, trust, etc.

Initially (see the October memo) there were to have been outright bequests to objectants and potential residuary trust interests as well. However, as of the December 2, 2004 memo decedent significantly departed from the original design such that objectants were effectively left out of the estate unless petitioner predeceased and he and petitioner had no children.

There are allegations of a falling out between petitioner and Warren Jr. over the course of the two years between the date of the questionnaire and execution of the will. These are alleged to have arisen from excluding Warren Jr. from certain business affairs his father had fostered for him with the law firm and the exclusion of Warren Jr. from the process of his father's and petitioner's estate planning. It would appear however that the two months in which decedent ostensibly changed course are what is significant.

The court has read the transcripts of the examinations of petitioner and attorney Siegal in their entirety. As regards the change in the estate plan as aforesaid and how the instructions were given to Siegal to make the changes, petitioner testified that: decedent's overall plan was that she and any children be taken care of; that at some point after October at their home the day before she and decedent were to met with Siegal her husband told her, without explanation, he was changing his estate plan to eliminate any provisions for objectants; that she did not agree with that decision and told him so whereupon he responded, "It's my money, I'll do what I want with it;" that her understanding as to why he was doing so as was to assure her and their children's financial future; and lastly, the issue was discussed at the meeting with Siegal (examination before trial, Sept. 17, 2013 at 69, 75-76, 116-117, 162, 164-165).

In terms of attorney Siegal, his moving affirmation states he is unaware of any undue influence exercised over decedent and that he (Siegal) would never permit a will he had drafted and he was having executed be done "under any improper circumstance." Further, the attorney draftsman avers: "The Will proffered is consistent with the wishes and *instructions of the decedent expressed to me*" (emphasis added). His SCPA 1404 testimony is uniform that the terms of the will and trust were consistent with the intentions and directions of the decedent (examination before trial, Apr. 25, 2013 at 90, 105, 113-114, 121-122, 202). Clearly the import here is that decedent and only decedent was the genesis of the change and the conveyor of that information to the draftsman.

A draft of decedent's will was inadvertently sent to Warren Jr. on January 18, 2005. He was upset that he and his sister were disinherited and concerned that his father may not have been fully aware of the consequences of what he was doing. Warren Jr. avers he reached out to Siegal. The lawyer responded that there were several alternatives considered and this is what his father wanted. Warren Jr. did not talk to his father directly despite Siegal's suggestion that he do so.

Warren Jr. then wrote the August 12, 2005 letter, supra, expressing: "My genuine concern is that these documents actually reflect your wishes." There is no indication of any communication between father and son thereafter. If decedent, arguendo, felt at all pressured to take Stacie and Warren Jr. out of his estate planning, this entreaty from his son a few months post-execution would afford the perfect opportunity for reflection and change. One can only speculate about reflection but the record evinces no change in the months and years that followed.

Objectants posit that the propounded instrument must have been the product of undue influence given their father's disdain for planning, petitioner's expanding roles as office manager, lover, and wife, her purported lead role in communicating with Siegal (which allegation does not appear to be borne out by the record as regards to decedent's estate), and the fact that they and their children were disinherited.

The natural objects of decedent's bounty were obviously his wife, his infant daughter Sydney and his adult children, the objectants. In structuring his estate plan, recognizing his heirs and their financial circumstances and needs, and trying to have a child with petitioner, it is not surprising for him to have had a

preference for his younger wife (27 years his junior) and Sydney than his grown children Stacie and Warren Jr. It certainly does not appear the decedent was a person of weak mind or personality susceptible to either subtle or overt influence and having apparently given Stacie and Warren Jr. as much as he could during their upbringing he wanted his new family to have the same. Although petitioner may have the motive and opportunity to exercise and/or influence, it remains an essential element of an undue influence case to prove that undue influence was actually exerted on decedent (*Matter of Fiumara*, 47 NY2d 845 [1979]).

Since no proof has been offered that undue influence was actually exerted on decedent, summary judgment is also therefore granted and that objection dismissed as a matter of law.

The proponent's motion for summary judgment is thus granted in toto.